IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OCP, S.A., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-4332 |
| | § | |
| COLORADO OTR, LP, | § | |
| HARRIS-MACCLAIN ENTERPRISES, | § | |
| LLC, and JASON BRADLEY HARRIS, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM AND ORDER ON POST-TRIAL MOTIONS

Pending is Defendants' Renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial (Document No. 114). After carefully considering the motion, response, and applicable law, the Court concludes for the reasons that follow that both motions should be denied.

Plaintiff OCP, S.A.'s ("Plaintiff") suit against Defendants Colorado OTR, LP ("Colorado"), Harris-McClain Enterprises, LLC ("Harris-McClain"), and Jason Bradley Harris ("Harris," and collectively, "Defendants") was for breach of contract and warranty claims arising out of Plaintiff's purchase from Colorado of 42 off-the-road tires for use in its mining operations in Morocco. The Jury returned a Verdict for Plaintiff OCP, S.A. ("Plaintiff") on

all controlling questions.[1] Plaintiff elected to recover under its breach of contract claim,[2] and the Court entered Final Judgment on August 23, 2013, awarding to Plaintiff recovery of the total sum of $3,888,698.65 from Defendants jointly and severally.[3] Defendants now move for judgment as a matter of law, or alternatively, for a new trial.[4] Defendants contend there was insufficient proof from which a reasonable jury could find that Harris participated in the control of Colorado or that Plaintiff reasonably believed Harris was a general partner of Colorado so as to hold him individually liable. They further argue that there was insufficient evidence from which a reasonable jury could find that Plaintiff revoked its acceptance of the tires, that the tires were non-conforming or defective at the time of delivery, or that the value of the tires accepted by Plaintiff was $0. They also contend that Plaintiff is not entitled to recover attorneys' fees in conjunction with its claim for breach of the implied warranty of merchantability. In the alternative, Defendants move for a new trial.[5]

---

[1] Document No. 101.

[2] Document No. 105 at 2.

[3] Document No. 110.

[4] Document No. 114.

[5] Document No. 115.

# I. Motion for Judgment as a Matter of Law

## A. Legal Standard

A motion for judgment as a matter of law should be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." Pineda v. United Parcel Serv., Inc., 360 F.3d 483, 486 (5th Cir. 2004) (citing FED. R. CIV. P. 50(a)). "A court should grant a post-judgment motion for judgment as a matter of law only when the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." Allstate Ins. Co. v. Receivable Fin. Co., L.L.C., 501 F.3d 398, 405 (5th Cir. 2007) (internal quotations omitted). When evaluating the sufficiency of the evidence, the Court views all evidence and draws all inferences in the light most favorable to the verdict. Id.

## B. Analysis

### 1. Whether there was sufficient evidence that (1) Harris participated in control and (2) Plaintiff reasonably believed that he was a general partner

The Jury found that Harris participated in control and that Plaintiff reasonably believed that he was a general partner.[6] *See*

---

[6] Question Eight asked, "Do you find that, in addition to the exercise of his rights and powers as a limited partner, Harris participated in the control of Colorado OTR?" The Jury answered "Yes." Document No. 101 at 21. Question Nine asked, "Do you find

TEX. BUS. ORG. CODE § 153.102(b) ("If the limited partner participates in the control of the business, the limited partner is liable only to a person who transacts business with the limited partnership reasonably believing, based on the limited partner's conduct, that the limited partner is a general partner.").

Defendants argue that there is no evidence that Harris participated in the control of the business so as to render him liable, because he engaged only in conduct protected by the 'Safe Harbor' provisions of Section 153.103.[7] *See* TEX. BUS. ORG. CODE § 153.103(1)(A), (B), and (E) (Vernon 2007) (A limited partner does not participate in control by acting as "an agent or employee of the limited partnership," "an agent or employee of a general partner," or "a member or manager of a limited liability company that is a general partner of the limited partnership."). Defendants allege Harris was acting at all times in his capacity as Harris-McClain's Managing Member and President or as Colorado's President and CEO.[8]

The evidence at trial, however, was that while negotiating the contract with Plaintiff, Harris signed correspondence identifying himself as "Partner-Colorado OTR LP," not as an agent, employee, or

---

that OCP, at the time it entered into the agreement with Colorado OTR, reasonably believed, based on Harris' conduct, that Harris was a general partner?" The Jury answered "Yes." Id. at 22.

[7] Document No. 115 at 4-10.

[8] Id. at 5.

officer of the partnership.[9] Moreover, he also handed out business cards representing himself as "partner."[10] Plaintiff's witnesses testified that they believed Harris was the person in charge at Colorado, and that they at the time were unaware that he was also the President of the company.[11] Plaintiff adduced ample evidence to support the Jury's findings that Harris participated in the control of Colorado OTR as if he were a general partner, and that

---

[9] *See, e.g.*, Plaintiff's Trial Ex. 4 (September 30, 2007 letter confirming that Adil Bouchama is "an official dealer representative for Colorado OTR LP in the territory of North Africa," and making no mention of Harris-McClain or Harris's status as an officer); Plaintiff's Trial Ex. 14 (April 22, 2008 sale terms letter addressed to Plaintiff, concluding with "We appreciate your business and look forward to working with OCP on all their tire needs," signed by:

(signature inscribed)
Brad Harris
Colorado OTR LP
Partner

with no mention of Harris-McClain or any company office held by Harris).

[10] Document No. 118, ex. 1 at 21:4-9 (testimony of Plaintiff employee Abderrahman Halmi that Harris's business card identified him as "partner").

[11] *See* Document No. 118, ex. 1 at 21:4-9 (testimony of Halmi that he "had the impression that [Harris] was the number one responsible party from the Colorado company."); id., ex. 2 at 52:4-10 (testimony of Plaintiff's Chief of Mine Division Yagoub El Bouchrifi that Harris "was the main person, and he signed Brad Harris as a partner. He was the person that made that decision, and for me he was the key person at Colorado as the one we had the most exchanges with . . . . We received the fact that he was the President only in the commitment letter.") (referencing May 28, 2009 commitment letter located at Plaintiff's Trial Ex. 56).

as a result of Harris's conduct Plaintiff reasonably believed that Harris was a general partner when it agreed to the contract.

2. Whether there was sufficient evidence that Plaintiff revoked its acceptance of the tires

To recover on a breach of contract claim, a buyer must show either that it rejected or that it revoked acceptance of the goods. *See* TEX. BUS. & COMM. CODE § 2.711. The Jury found that Plaintiff revoked its acceptance of the tires.[12]

Defendants argue that there was no evidence that Plaintiff revoked its acceptance or notified Plaintiff of the revocation.[13] Plaintiff's evidence, however, was that in June, 2009, Colorado's representatives traveled to Morocco and conducted a week-long investigation into the causes of the tire failures.[14] At the end of that week, the Colorado representatives met with Plaintiff's employees, and the parties concluded that the tires were "not fit for use" on Plaintiff's trucks, and that "Colorado agrees to replace as soon as possible all of the tires (42) under warranty."[15]

---

[12] Question No. 1 asked "Do you find that OCP revoked acceptance of the Tires?" The Jury answered "yes." Document No. 101 at 12.

[13] Document No. 115 at 15-20.

[14] Document No. 118, ex. 1 at 80:19-85:2.

[15] Plaintiff's Trial Ex. 53-B.

When Colorado had failed to replace the tires by March, 2010, Plaintiff sent a letter complaining that the replacement still had not occurred, and requesting that Colorado "please respect your commitment."[16] This is sufficient evidence to support a rational Jury's finding that Plaintiff revoked its acceptance and provided adequate notice to Defendants. *See* Emerson Elec. Co. v. Am. Permanent Ware Co., 201 S.W.3d 301, 311 (Tex. App.–Dallas 2006, no pet.) (there was sufficient evidence to support a finding that buyer rejected or revoked acceptance where buyer had, *inter alia*, demanded replacement goods); *see also* TEX. BUS. & COMM. CODE § 2.608, cmt. 5 ("The content of the notice under subsection (2) is to be determined in this case as in others by considerations of good faith, prevention of surprise, and reasonable adjustment.")

Defendants further argue that Plaintiff's continued use of the tires precluded revocation.[17] However, whether a buyer's continued use of goods undoes its revocation of acceptance depends on whether the use was reasonable. Toshiba Machine Co., Am. v. SPM Flow Control, Inc., 180 S.W.3d 761, 772 (Tex. App.–Fort Worth 2005, pet. granted, judgm't vacated w.r.m.) (finding that there was sufficient evidence to support jury's finding that buyer revoked acceptance even though buyer had used machines for 17,000 hours). Factors

[16] Document No. 118, ex. 2 at 24:17-25:23 (English translation); Plaintiff's Trial Ex. 78-A (original document written in French).

[17] Document No. 115 at 20-24.

relevant to whether use is reasonable include whether the buyer is using the goods during the time when the seller is promising to cure, the degree of economic hardship the buyer would suffer if it discontinued using the goods, and the reasonableness of the use as a method of mitigating damages. Id. at 772-73. Plaintiff presented evidence that there was a scarcity of replacement tires in the marketplace, and if it had stopped using the defective tires it would have stopped the production of the mine.[18] Plaintiff also produced a September 2, 2009 email from Harris in which he instructed Plaintiff that "because you are running low on available tire inventory we recommend that you continue running all the tires currently in your stock."[19] The Jury had sufficient evidence from which to find that Plaintiff's continued use of the tires was reasonable.

3. Whether there was sufficient evidence that the tires were non-conforming at the time of delivery

Defendants argue that there is no evidence that the tires were non-conforming or defective at the time of delivery because Plaintiff's expert, John M. Smith, offered only conclusory

---

[18] Document No. 118, ex. 2 at 10:3-24 (testimony of El Bouchrifi).

[19] Plaintiff's Trial Exhibit 68.

testimony.[20] However, Smith testified that he had inspected all 42 of the tires,[21] and performed laboratory testing on samples cut from Tire No. 20.[22] Based on his inspection of all 42 tires and his laboratory testing of samples cut from a representative exemplar, Smith identified multiple specific defects in the tires.[23]

---

[20] Document No. 115 at 25-29. Question No. 2 asked, "Do you find that Colorado OTR failed to comply with its contract with OCP by delivering non-conforming goods?" The Jury answered "Yes." Document No. 101 at 13.

[21] Document No. 118, ex. 4 at 19:11-14, 20:4-18, 22:6-12.

[22] Id. at 39:1-40:13. Defendants object to the fact that Smith tested samples taken only from one of the tires. Document No. 115 at 27. However, Smith testified that he selected Tire No. 20 because it was a "good representative sample of the 24 tires that had failed." Document No. 118, ex. 4 at 22:13-22. He also testified that 40 of the 42 tires were cured in the same mold. Id. at 21:10-22:3. Furthermore, Plaintiff presented evidence from which the jury could infer that all 42 of the tires were manufactured in the same batch. *See* Plaintiff's Trial Ex. 12 (email from Plaintiff's employee recounting that Colorado representatives said tires must be manufactured in a minimum batch of 50 units and proposed selling 42 to Plaintiff and retaining eight for Colorado's own inventory). Thus, the fact that Smith tested samples from only one tire does not render his testimony conclusory or speculative.

[23] *See, e.g.*, Document No. 118, ex. 4 at 31:21-32:25 (sample of inner liner from Tire No. 20 was "extremely thin"); id. at 34:19-35:13 ("starburst" pattern in sample from Tire No. 20 indicated that liner failed to keep air out of the tire and "blew out to the inside of the tire"); id. at 37:14-24 (defects in belt cables in Tire No. 20); id. at 62:4-13 (identifying defective ply wires shown in photograph of Tire No. 26); id. at 70:15-25 (identifying "wild wires" failure shown in photograph of Tire No. 17); id. at 77:22-78:6 (similar failure modes, including circumferential breaks and bulges inside the tires, support conclusion that all 42 tires had snaked, wavy cables); id. at 42:4-47:3 (laboratory testing on samples from Tire No. 20 indicate that it was not properly cured).

Defendants also protest that Smith did not rule out improper mounting or misuse as causes of the failures.[24] However, Smith testified that the types of failures experienced by the tires would not have been caused by hitting a rock in the road,[25] and that "[p]erfect roads" and "perfect maintenance" would not have prevented the tires from failing.[26] Accordingly, Smith's testimony was competent evidence from which the Jury could conclude the tires were defective. *Cf.* Ferrari v. Kohler Co., Civ. A. No. H-05-2612, 2006 WL 2987706, at *4 (S.D. Tex. Oct. 17, 2006) (Lake, J.) (expert testimony that generator malfunction was due to manufacturing defect was not sufficient evidence to withstand summary judgment where expert did not state what such a defect might be, nor did he rule out other possible causes of malfunction).

Defendants further argue that there is no evidence Plaintiff properly used any of the tires, but if there was, such evidence was insufficient to establish that the goods were non-conforming because other possible causes of malfunction were not ruled out.[27] Although this was a subject of contention at trial, there was much evidence, certainly ample, from which a rational jury could

---

[24] Document No. 115 at 29-34.

[25] Document No. 118, ex. 4 at 66:6-68:2.

[26] Id. at 75:2-8.

[27] Document No. 115 at 34-36.

conclude that Plaintiff properly used the tires,[28] and that the failures were caused by manufacturing defects rather than misuse.[29] Thus, Defendants' contention that there was not sufficient evidence to support the Jury's finding that the goods were non-conforming at

---

[28] *See, e.g.*, Document No. 118, ex. 1 at 11:15-12:17 (roads are "totally flat" and are maintained continuously by special road maintenance teams); id. at 17:2-23 (roadway inspector is "constantly going through the air [when] the truck drives by" and immediately calls the roadways department to fix potholes or pick up fallen rocks); Document No. 118, ex. 2 at 121:13-20 (Plaintiff received a certificate from Bridgestone (a vendor of off-the-road tires successfully used by Plaintiff on its trucks in the same mines) certifying that Plaintiff's roadways are in very good condition and that it manages the tires well); Document No. 118, ex. 1 at 14:14-13 (tire specialists check the air pressure in the tires every morning); id. at 15:11-16:4 (tire specialists receive one year of training at training center, and additional on-the-job training).

[29] Plaintiff's expert, John M. Smith, ruled out misuse as a cause of the tire failures. Plaintiff also presented evidence from other sources in support of this conclusion. *See, e.g.*, Document No. 118, ex. 1 at 6:23-7:5, 33:11-16 (Halmi, who was in charge of the MEA mine from 2007 to 2009, testified that "since the tire was exploding, this is a manufacturing defect that could generate this problem, based on my experience."). *See also* Document No. 118, ex. 3 at 21:3-16, 25:2-11 (during Colorado inspection, tire temperature and pressure were high even when trucks were driven at reduced speed and weight); Plaintiff's Trial Ex. 56 (May 28, 2009 letter from Harris stating that "all of the tires experiencing these manufacturing defects will be replaced," that Colorado does "not want to make the mistake of speedily manufacturing a new batch of 42 tires without correcting the problem," and that "[b]ased on Mr. Stephenson's findings, he will be able to work with the tire manufacturing engineers next week to isolate the problems and make the necessary corrections."); Document No. 118, ex. 1 at 33:17-21 (Halmi testified that Plaintiff had problems with other brands of tires, "but not of this magnitude. We may have a problem on 1 out of 50 tires; but out of 15 tires that the 15 explode, there's a problem."); Document No. 118, ex. 3 at 72:2-5, 73:9-16, 79:7-16 (Michelin tires operated under the same conditions at Plaintiff's mines lasted an average of 12,451.5 hours while Colorado tires lasted an average of only 693.5 hours).

the time of delivery is without merit. Defendants have not shown themselves entitled to judgment as a matter of law.

## II. Motion for New Trial

### A. Legal Standard

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1). A denial of a motion for new trial is subject to review only for abuse of discretion. King v. Exxon Co., U.S.A., 618 F.2d 1111, 1115 (5th Cir. 1980). "A decision to grant a new trial is, however, accorded less deference than a decision denying the grant of a new trial." Laxton v. Gap Inc., 333 F.3d 572, 586 (5th Cir. 2003).

### B. Analysis

#### 1. Whether the Court erred in admitting portions of Smith's testimony over Defendants' objections

The Court granted Defendants' pretrial Motion to Exclude the Revised Report and Opinions of John M. Smith because it was late-filed after the supplemental report deadline; and Smith's testimony at trial was therefore limited to opinions set forth in his initial

expert report.[30] In his initial report, based on destructive testing performed on only one tire, Smith concluded that the tires failed because they were not properly vulcanized. Smith's suppressed supplemental report described additional destructive testing Smith later performed on a total of 11 tires, which led him to conclude that the tire failures were caused by additional factors.[31] Defendants argue that the Court erred in allowing Smith to testify at trial as to the additional destructive testing and as to his revised conclusion that the 28 tires placed in use had failed due to "(1) irregular and deficient inner liners; (2) ply wires that were 'wavy' or 'snaked,' and inadequate ply tension; and (3) 'deficient or marginally deficient' vulcanization."[32]

Although Smith concluded in his initial report that the tires failed because they were not properly vulcanized, he had also identified additional manufacturing defects and confirmed in his testimony to the Jury that his report included the following finding:

> In addition to containing the vulcanization-related defects described above, which caused the Tires to fail, the Tires contained additional flaws of a different

---

[30] *See* Document No. 68.

[31] Document No. 115 at 50.

[32] Id. at 48.

> nature that materially impacted the strength and durability of the Tires.[33]

In his initial report, Smith described these additional flaws as including "variations and inconsistencies . . . in the thickness of the ply layers," "ply wires [that] were not taut (are 'snaked')," and "ply tension [that] was not adequate."[34] Plaintiff's attorney on redirect examination of Smith asked the expert witness to confirm--which he did--that he indeed had given notice in his initial report of his observations about the ply layers, the inner lining thickness, the ply wires not being taut, or "snaked" ply wires, and ply tension not being adequate. Even in the final round of cross-examination by Defendants' counsel, however, Smith adhered to the initial report's conclusion that the tires were improperly cured, that is, improperly vulcanized, based on Smith's testing of a single tire.[35] Defendants do not cite to any portion of the trial transcript to support their argument that the Court improperly permitted testimony beyond the scope of Smith's initial report.[36] Moreover, Defendants do not identify any specific errors in the Court's rulings on the three objections made by Defendants during

---

[33] Document No. 118, ex. 6 at 5-6.

[34] Id. at 6-7.

[35] Document No. 118, ex. 4 at 128:22-129:3.

[36] *See* Document No. 115 at 47-52.

Smith's testimony.[37] Defendants are not entitled to a new trial on these objections.

2. Whether the Court erred in barring Defendants' expert from testifying regarding VBox data

Defendants argue that the Court committed reversible error when it declined to allow defense expert Tom Stephenson to testify regarding "VBox" data.[38] Plaintiff objected that the data had not been produced during discovery.[39] Defendants state that they produced a disk containing the data nearly a year before trial, but were unable at trial--or now--to produce a transmittal letter or other documentation of such a production, possibly, they believe,

[37] Defendants' attorney asked to approach the bench because he wanted "to be sure we are not getting into a causation problem," but the Court stated that an objection was premature, as Smith had not yet said that the wavy ply cables were a cause of the failure. Document No. 118, ex. 4 at 59:13-60:1. Defendants' attorney objected again when Plaintiff's attorney asked Smith about the consequences of having snaked wires in the tires. Id. at 63:24-65:3. The Court observed that the issue was raised in Smith's initial report. Id.; *see also* Document No. 118, ex. 6 at 6-7. Defendants' only other objection was to the admission of Plaintiff's Exhibits 124, 128, and 129, which were tire samples Smith had cut from Tires No. 19, 36, and 39, which he used to demonstrate his findings about the inner liners, the ply cables, and what he called a "mystery component." When this examination concluded, Plaintiff offered in evidence the three exhibits--which already had been fully exhibited to the Jury while Smith testified. Defendants' only objection was that the exhibits were not shown to have been cut from Tire 20, which the Court overruled. Moreover, the samples already had been fully exhibited and explained to the Jury without objection. *See* Document No. 118, ex. 4 at 80:21-81:2.

[38] Document No. 115 at 52-54.

[39] Id. at 52.

because Defendants' counsel sent it when he was employed by another firm.[40] Evidence requested and not produced during pretrial discovery may not be admitted at trial unless the error was substantially justified or is harmless. FED. R. CIV. P. 37(c). Defendants allege that the error was harmless because Defendants informed Plaintiff prior to trial that Stephenson would testify regarding the VBox data, and thus Plaintiff could not have been surprised by his testimony.[41] However, Plaintiff presented evidence that it informed Defendants before trial, on June 9, 2013, that it had not received from Defendants a copy of the compact disc containing the VBox data, listed as Defense Exhibit Number 125, and that Plaintiff needed it immediately to prepare for trial.[42] Defendants replied that they were withdrawing the VBox data listed as Exhibit Number 125, which they did, and Plaintiff therefore did not pursue the matter.[43] In light of the parties' conflicting recollections and assertions on whether Defendants had produced for Plaintiff the V-Box data disc (which Defendants describe as

---

[40] Id. at 52-53.

[41] Id. at 53. Defendants assert that they informed Plaintiff that Stephenson would testify about the VBox data in their May 2012 Designation of Expert Witnesses, Plaintiff's Trial Ex. 110. Defendants also point out that they listed the compact disk containing the data on their December 2012 Exhibit List, Document No. 44-3 at 12, and that Stephenson's expert report analyzed the VBox data. Plaintiff's Trial Ex. 111.

[42] Document No. 87, ex. D ¶ 4.

[43] Id.

technical data retrieved from instruments Defendants installed on several of Plaintiff's trucks), Defendants' inability to prove that they did produce for Plaintiff this sole missing item of evidence, and Defendants' pretrial withdrawal from their exhibit list of the disc containing the raw V-Box data, the Court sustained Plaintiff's objection to Defendants' expert being allowed to testify to the content of that V-Box data. In the Court's opinion, this ruling was not error and is not cause to grant a new trial.[44]

## III. Order

For the foregoing reasons, it is

[44] Defendants further contend that the Court committed reversible error in declining to instruct the Jury on proximate causation in the Jury question regarding the amount of damages Plaintiff suffered as a result of Defendants' breach of the implied warranty of merchantability. Document No. 115 at 54-56. Defendants argue that the Fifth Circuit erred when it ruled in Calloway v. Manion, 572 F.2d 1033, 1037 n.6 (5th Cir. 1978), that proof of proximate causation is required only when the plaintiff seeks consequential damages. Document No. 115 at 54-56. As Plaintiff elected to recover under its breach of contract theory, rather than its breach of warranty theory, this issue is moot. Moreover, the Court is bound by the Fifth Circuit's ruling. Defendants also move for a new trial on the basis of the cumulative effect of alleged errors and insufficiency of the evidence. Id. at 56-58. Finding no reversible error and that the evidence was sufficient to support the verdict, the motion is denied.

ORDERED that Defendants' Renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial (Document No. 114) are both in all things DENIED.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

SIGNED at Houston, Texas, on this 10th day of December, 2013.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE